Sutton, J.
*289 ¶ 1 Darcy Dean Racus appeals his convictions for attempted first degree rape of a child and communicating with a minor for immoral purposes. Racus argues[1] *290 that the trial court erred by denying his motion to suppress private communications that he had with an undercover Washington State Patrol (WSP) detective because he did not consent to these communications being recorded as required by the Washington Privacy Act (WPA).[2] We disagree.
¶ 2 In the published portion of the opinion, we hold that Racus's communications with the undercover detective that occurred before the authorization to record was issued (referred to as "pre-intercept communications") were private, but that Racus impliedly consented to the communications being recorded, and thus, the trial court did not err by denying the motion to suppress the pre-intercept communications.
¶ 3 In the unpublished portion of the opinion, we reject all additional arguments and hold that probable cause supported the authorization to record Racus's communications; thus, the trial court did not err by denying the motion to suppress Racus's communications with the undercover detective that occurred after the authorization to record was issued (referred to as "post-intercept communications"). We further hold that the trial court did not err by refusing to give an entrapment instruction because the evidence did not support giving the instruction. We also hold that the State presented sufficient evidence to allow the jury to find that Racus took a substantial step toward committing the crime of attempted first degree rape of a child. Lastly, we hold that because Racus did not object at trial and fails to show that any of the prosecutor's arguments were so flagrant and ill-intentioned that they could not have been cured with an instruction, he has waived his claim of prosecutorial misconduct. We affirm.
*291 *833 FACTS
I. BACKGROUND
¶ 4 On December 17, 2015, WSP Detective Sergeant Carlos Rodriguez (Det. Rodriquez) posted an advertisement on Craigslist as part of an online sting operation by the Washington State Patrol Missing and Exploited Children's Task Force (MECTF). The advertisement was posted in the "casual encounters" section of Craigslist. Det. Rodriguez posed as a female parent seeking others to have sexual contact with her minor children. The advertisement stated, "Looking for a close family connection - 2 dau, [ ] 1 son - w4w (Tacoma)." 4 Verbatim Report of Proceedings (VRP) at 602. The body of the advertisement stated,
I just moved here and looking for someone to connect with my young family. Would like a woman's touch, but open to a man as well, must be discrete, no solicitations, open to presents. No RP.
4 VRP at 605.
¶ 5 Det. Rodriguez later explained at trial that "dau" means daughters and "w4w" means woman for woman. Using an anonymous e-mail address, Det. Rodriguez posed as a fictitious mother named "Kristl," who had three minor children. Det. Rodriguez's computer used Google Hangouts software to preserve the messages received by persons who responded to the advertisement.
¶ 6 On December 17, Racus answered the advertisement. He then engaged in a series of e-mails and text messages with "Kristl," asking about having sex and asking about her children. The next day, Racus reinitiated contact though another series of e-mails and then text messages.
¶ 7 On December 18 at 4:00 PM, Det. Rodriguez obtained an authorization to record communications. The intercept authorization was based on Det. Rodriguez's belief that there was probable cause to believe Racus would engage in *292 the commercial exploitation of a minor for sex for a fee later that day when he met "Kristl" and her children. Based on the intercept authorization, Det. Rodriguez recorded all communications with Racus after December 18 at 4:00 PM, including numerous text messages and two telephone calls related to Racus's desire to meet with the mother and her children for sex.
¶ 8 During the two telephone calls with "Kristl," Racus agreed to meet the mother and her children at their house to have sex, and then obtained the address of "Kristl's" house. After arriving at "Kristl's" house and greeting her, Racus was arrested. The State charged Racus with attempted first degree rape of a child and communicating with a minor for immoral purposes.[3]
¶ 9 Prior to trial, Racus filed a motion to suppress the communications that occurred before the authorization to record based on a lack of consent. Racus also moved to suppress the communications that occurred after the authorization to record based upon a lack of probable cause. The trial court reviewed the transcript of all of the communications both before and after the authorization to record communications, and found that Racus "implicitly or impliedly" consented to the recording of the pre-intercept communications and text messages. Clerk's Papers (CP) at 249-50. Accordingly, the court denied the motion to suppress the pre-intercept text messages. The trial court also ruled that probable cause existed to authorize the intercept and denied the motion to suppress the post-intercept communications.
II. TRIAL TESTIMONY
¶ 10 At trial, Det. Rodriguez testified about the sting operation that resulted in Racus's arrest. Det. Rodriguez *293 explained that he completed an online form on Craigslist using a fictitious name and an anonymous e-mail address. Using the name "Kristl" and the e-mail address, Det. Rodriguez then typed the message and posted the advertisement in the "casual encounters" section of Craigslist which is viewed by persons looking for people to engage in sex. He explained that each advertisement on Craigslist is assigned a unique post identification number that lists the date and time of the particular *834 posting. He testified that a person responding to the advertisement would contact him using the anonymous e-mail address. Det. Rodriguez would respond via e-mail and then attempt to have the person agree to respond back by text message and then by telephone.
¶ 11 The Craigslist advertisement posted on December 17 contained the phrase "looking for a close family connection." 4 VRP at 602. Det. Rodriguez explained that he used this phrase because "close family ... generally means something dealing with incest." 4 VRP at 585. The advertisement also contained the phrase "open to presents." 4 VRP at 605. Det. Rodriguez explained that he used the words "presents," "gifts," and "donations" in the advertisement because those words are commonly used on Craigslist to suggest payment for a fee or the exchange of money for sex. 4 VRP at 586-87. He also explained that the term "RP" as used in the advertisement means role play. 4 VRP at 605.
¶ 12 Det. Rodriguez testified that Racus responded to the advertisement on Craigslist on the same day it was posted. Racus's full name appeared in the e-mail response. Because Racus had an account with Craigslist, the post identification number "4747" on the first e-mail sent by Racus allowed Det. Rodriguez to verify that a person by the name of Darcy Racus was responding to the same Craigslist advertisement that he had posted in the casual encounters section earlier that day. 4 VRP at 603.
¶ 13 Det. Rodriguez testified that he was able to capture, preserve, and record his communications with Racus using *294 a Gmail account. Det. Rodriguez was able to display the communications to and from Racus to the jury.
¶ 14 In his initial e-mail to "Kristl," Racus stated, "A little more detail, please." 5 VRP at 662. Det. Rodriguez responded by e-mail, "What are you looking for? I am looking for someone with close family experience. I was very close with my father and brother." 5 VRP at 663. Racus e-mailed that he was "looking to give a gal some oral and anything else sexual she needs." 5 VRP at 665. "Kristl" responded, "What are your age limits? My girls are nearly 12 and 8. My oldest is very mature for her age. More restrictions with the 8, but she is good for oral." 5 VRP at 666. Racus asked, "How old are you?" 5 VRP at 667. "Kristl" e-mailed, "I am 39, but this is more for them. I'm always present, but I'm into watching to make sure they are ok and happy." 5 VRP at 667.
¶ 15 Racus e-mailed, "Really need to be of legal age. A person can go to jail over that. If you are interested in receiving oral, I don't mind if they watch or even do their own thing. You have photos?" 5 VRP at 667. "Kristl" acknowledged that Racus could go to jail and asked whether he would feel more comfortable texting. Racus replied, "Do you host and when would this take place?" 5 VRP at 672. "Kristl" explained that the person would come to her place. Racus then e-mailed and asked, "You no longer interested? I have until 3." 5 VRP at 663. "Kristl" e-mailed that she was "not home till 4. Can do tomorrow. Text me [at the telephone number provided]. Text your name and word till three." 5 VRP at 675. In his last e-mail that day, Racus asked, "So what is it you are looking to get out of this? So we are on the up and up." 5 VRP at 677.
¶ 16 The next day, December 18, Racus reinitiated contact by text at 11:27 AM and asked, "Darcy till three. Is this free? Or are you looking for something?" 5 VRP at 679. Soon after, he e-mailed the same message in all capital letters. Racus e-mailed again and said, "What you wanting from me? You ask that I text you today and I did. No response.
*295 You still interested?" 5 VRP at 683. He then e-mailed, "Hello? Family connection?" 5 VRP at 698. In response, "Kristl" texted back, "Sorry, Darcy. So many people answer on here and it's hard to see who is real and not a flake." 5 VRP at 699. Racus texted back, "I am real." 5 VRP at 699. "Kristl" texted and asked what experience Racus had and what he wanted. Racus promptly texted, "Not much. Looking to give oral and maybe receive if all are clean. What is it you are looking for?" 5 VRP at 700. "Kristl" texted, "That sound[s] good[ ]. This is more for my family to have the same experience that I had growing up. My son is 13, my daughters are nearly 12 and 8." 5 VRP at 700.
*835 ¶ 17 After several texts, Racus asked if the mother wanted to meet. "Kristl" texted, "Not till I know what you want, hun, and I have a system. I have to talk to you first." 5 VRP at 708. He then texted, "Want to orally please a gal and have it done back to me. Or sex." 5 VRP at 708. "Kristl" texted, "So which one gal, hun? Oral pleasure is always good." 5 VRP at 709. Racus texted, "Yes it is. Older or you." 5 VRP at 709. "Kristl" texted that Lisa, her fictitious daughter, was nearly twelve years old.
¶ 18 Racus and "Kristl" continued to text and then talked on the telephone. In response, Racus asked Kristl to explain the rules of the encounter, "Kristl" texted, "No pain, no anal, condoms if more than oral," Racus texted, "Ok. Good with that." 5 VRP at 714. After this message at 4:00 PM, Det. Rodriguez requested and obtained an intercept authorization warrant from a supervisor based on his belief that Racus was going to engage in the commercial exploitation of a minor for a fee when he went to meet with "Kristl" later that day. The intercept authorized Det. Rodriguez to record all communications with Racus from that point forward.
¶ 19 "Kristl" and Racus spoke on the telephone and during those calls, "Kristl" confirmed that Racus wanted to have oral sex. When "Kristl" asked Racus which of the daughters he would prefer to have sex with, he responded, "Lisa. Have a pic?" 5 VRP at 711. Det. Rodriguez sent a *296 picture of a young girl. During another telephone call, Racus mentioned Lisa's braces as he saw them in the picture that "Kristl" sent him. "Kristl" assured Racus that Lisa could give him oral sex without scraping his genitals. Det. Rodriguez then handed the telephone to another undercover officer posing as Lisa. Racus asked Lisa if she was looking forward to their meeting, she said yes and referred to all of her other friends' experiences.
¶ 20 Racus then coordinated with "Kristl" when and where to meet them. On his way to meet them, "Kristl" asked Racus to bring Skittles for Lisa because "[s]he asked for some." 5 VRP at 716. Racus said he would try and then confirmed that he had obtained a bag of Skittles for Lisa. Racus arrived at the agreed address provided by "Kristl." Another female undercover officer posing as "Kristl" greeted Racus at the door of the house. Officers then arrested Racus.
III. VERDICT
¶ 21 The jury found Racus guilty of attempted first degree rape of a child and communicating with a minor for immoral purposes. The trial court sentenced Racus to a standard range sentence. He appeals his convictions.[4]
ANALYSIS
I. COMMUNICATIONS BEFORE AUTHORIZATION
A. LEGAL PRINCIPLES
¶ 22 Racus first argues that the trial court erred by failing to suppress the pre-intercept recorded communications because he did not consent to their being recorded under the WPA. We disagree because Racus impliedly consented to the pre-intercept e-mails and text messages being *297 recorded under the WPA. Thus, we hold that the trial court did not err by denying Racus's motion to suppress the pre-intercept communications.
¶ 23 The WPA provides that it is unlawful for any individual or for the State to intercept or record a private communication or conversation, by any device, electronic or otherwise, without obtaining the consent of all of the parties participating in the conversation. RCW 9.73.030(1)(a), (b). Under the WPA, a communication is private when parties manifest a subjective intention that it be private and where that expectation is reasonable. State v. Kipp , 179 Wash.2d 718, 729, 317 P.3d 1029 (2014). Proof of subjective intent need not be explicit. Kipp , 179 Wash.2d at 729, 317 P.3d 1029.
¶ 24 When analyzing alleged violations of the WPA, we consider (1) whether there was a private communication transmitted by a device, which was (2) intercepted or *836 recorded by use of (3) a device designed to record and/or transmit, and (4) was done without the consent of all parties to the private communication. State v. Townsend , 147 Wash.2d 666, 672-75, 57 P.3d 255 (2002). We review alleged violations of the WPA de novo. Kipp , 179 Wash.2d at 728, 317 P.3d 1029.
B. PRIVATE COMMUNICATIONS
¶ 25 We first consider whether the communications between Racus and "Kristl" were private and whether the expectation that they be private was reasonable. See Townsend , 147 Wash.2d at 672-74, 57 P.3d 255. Text messages encompass many of the same subjects as telephone conversations and e-mails, which have been protected under the WPA. See State v. Faford , 128 Wash.2d 476, 488, 910 P.2d 447 (1996) ; Townsend , 147 Wash.2d at 680, 57 P.3d 255. The term "private" is not defined in the WPA, but we have adopted a dictionary definition: " 'belonging to oneself ... SECRET ... intended only for the persons involved (a ~ conversation) ... holding a confidential relationship to something ... a secret message:
*298 a private communication ... SECRETLY : not open or in public.' " Kipp , 179 Wash.2d at 729, 317 P.3d 1029 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1804-05 (1969) ) (alterations in original); Kadoranian v. Bellingham Police Dep't , 119 Wash.2d 178, 190, 829 P.2d 1061 (1992).
¶ 26 Here, Racus thought he was texting "Kristl." He manifested his subjective intent that the text messages would remain private by not using a group texting function, or indicating in any other manner that he intended to expose his communications to anyone other than "Kristl." See Townsend , 147 Wash.2d at 673, 57 P.3d 255. The expectation that these were private communications was reasonable given that Racus was only texting with "Kristl" and only "Kristl" was texting him back. Because he intended that the communications be kept private and his expectation that they were private communications was reasonable, the communications were private under the WPA.
C. INTERCEPTED OR RECORDED BY USE OF A DEVICE DESIGNED TO RECORD AND/OR TRANSMIT
¶ 27 We next consider the second and third prongs of the test, whether the communication was intercepted or recorded by use of a device designed to record and/or transmit. Townsend , 147 Wash.2d at 672, 57 P.3d 255. The parties do not dispute this fact. Here, Det. Rodriguez testified that his computer captured, preserved, and recorded all communications with Racus using the anonymous Gmail account and a Google software application installed on his computer as part of the sting operation. Thus, the communications were intercepted and recorded by use of a device designed to record and/or transmit under the WPA.
D. CONSENT
¶ 28 Lastly, we consider whether Racus consented to the communications being recorded. Townsend , 147 Wash.2d at 672, 57 P.3d 255. If Racus consented, then the recording was not unlawful under the WPA because it is not unlawful to *299 record a communication on a device where the "consent of all the participants in the communication" has been obtained. RCW 9.73.030(1)(a) ; see RCW 9.73.030(1)(b). A communicating party will be deemed to have consented to having his or her communication recorded when the party knows that the messages will be recorded. See Townsend , 147 Wash.2d at 672, 57 P.3d 255.
¶ 29 In Townsend , the police recorded and tracked the defendant's e-mail and instant messages to a fictitious adolescent girl that police created for a sting operation.[5] Townsend , 147 Wash.2d at 670, 57 P.3d 255. Our Supreme Court held that although the defendant did not explicitly announce that he consented to the recording of his e-mail and instant messages to his fictitious target, his consent to such recordings could be implied
[b]ecause [the defendant], as a user of e-mail had to understand that computers are, among other things, a message recording *837 device and that his e-mail messages would be recorded on the computer of the person to whom the message was sent, he is properly deemed to have consented to the recording of those messages.
Townsend , 147 Wash.2d at 676, 57 P.3d 255. The court noted that "the saving of messages is inherent in e-mail and ... messaging" and through his use and familiarity of such systems, the defendant had impliedly consented to the recording of such messages. Townsend , 147 Wash.2d at 678, 57 P.3d 255.
¶ 30 The Supreme Court stated,
"A person sends an e-mail message with the expectation that it will be read and perhaps printed by another person. To be available for reading or printing, the message first must be recorded on another computer's memory. Like a person who leaves a message on a telephone answering machine, a person who sends an e-mail message anticipates that it will be recorded. That person thus implicitly consents to having the message recorded on the addressee's computer."
*300 Townsend , 147 Wash.2d at 676, 57 P.3d 255 (quoting State v. Townsend , 105 Wash. App. 622, 629, 20 P.3d 1027 (2001) ).
¶ 31 Here, the pre-intercept communications sent by Racus to "Kristl" were communications made by Racus in response to an advertisement in the casual encounters section of Craigslist. Racus had created a Gmail account to use Craigslist and to respond to the advertisement posted by Det. Rodriguez. Racus also testified that he was aware that the text messages "would be preserved and potentially seen." 6 VRP at 1032. As a result, in his text messages to "Kristl," Racus avoided explicitly stating that it was his intent to engage in oral sex with "Kristl's" fictitious eleven-year-old daughter.
¶ 32 Similar to the defendant in Townsend , here, Racus had to understand that computers are message recording devices and that his text messages with "Kristl" would be preserved and recorded on a computer. See Townsend, 147 Wash.2d at 678, 57 P.3d 255. By communicating in this way, Racus impliedly consented to the communications being recorded, and thus, the recording of the communications was lawful under RCW 9.73.030(1)(a). Because the recording of the pre-intercept communications was lawful, the trial court did not err by denying Racus's motion to suppress the pre-intercept e-mail and text messages.[6] Thus, this argument fails.
*301 II. COMMUNICATIONS AFTER AUTHORIZATION
¶ 33 Racus next argues that the trial court erred by not suppressing the post-intercept communications. Racus argues that Det. Rodriguez lied to the supervisor when he claimed that Racus and "Kristl" had a discussion about "trading gifts in exchange for sex with minors," as required for an intercept to be lawfully authorized under RCW 9.73.230(1)(b)(ii). Appellant's Opening Br. at 33. Racus argues that no reasonable detective would have had probable cause to believe that Racus was engaging in the commercial sexual abuse of a minor. Therefore, he argues that the requirements of RCW 9.73.230(1)(b)(ii) were not met for the supervisor to authorize an intercept to record the communications Racus had with "Kristl" after 4:00 PM on December 18. We disagree.
¶ 34 The WPA allows for communications to be recorded when authorized by someone above a "first line supervisor" if "[p]robable cause exists to believe that the conversation or communication" will involve "[a] party engaging in the commercial sexual abuse of a minor." RCW 9.73.230(1)(b)(ii).
¶ 35 Former RCW 9.68A.100(1)(c) (2013) provides that a "person is guilty of commercial sexual abuse of a minor if ... [h]e or she *838 solicits, offers, or requests to engage in sexual conduct with a minor in return for a fee." The WPA also provides that "[a]ny information obtained in violation of RCW 9.73.030... [is] inadmissible." RCW 9.73.050.
¶ 36 Probable cause exists where the facts and circumstances are within the officer's knowledge and the facts and circumstances are such that the officer has reasonably trustworthy information sufficient to warrant a person of reasonable caution to believe that an offense has been committed. State v. Terrovona , 105 Wash.2d 632, 643, 716 P.2d 295 (1986). Probable cause requires more than a bare suspicion of criminal activity.
*302 Terrovona , 105 Wash.2d at 643, 716 P.2d 295. Whether probable cause exists is a legal question that we review de novo. State v. Neth , 165 Wash.2d 177, 182, 196 P.3d 658 (2008).
¶ 37 Det. Rodriguez testified that the terms "presents," "gifts," and "donations" and the phrase "open to presents" as used in the advertisement, are used by persons viewing the Craigslist casual encounters section to suggest payment for a fee or the exchange of money for sex. 4 VRP at 586-87, 605. Shortly after contacting "Kristl," Racus e-mailed and asked, "So what is it you are looking to get out of this? So we are on the up and up." 5 VRP at 677. When Racus did not receive a response, he followed up the next morning by sending an e-mail and then a text message asking, "Is this free? Or are you looking for something?" 5 VRP at 679-80. He then sent a series of e-mail and text messages attempting to set up sex between him and "Kristl's" daughter. Based on all of these communications, Det. Rodriguez requested and obtained an intercept authorized by a supervisor.
¶ 38 In the case at bar, Racus responded to an advertisement that requested a sexual encounter with a minor, the advertisement used a colloquialism for payment, and Racus asked about payment. The communications that Racus exchanged with "Kristl" establish that he was aware that she was offering her two minor daughters for sex in exchange for a fee and that he appeared interested in paying.
¶ 39 All of these communications demonstrate that Racus intended to exchange sex with a minor for a fee. Thus, we hold that based on the totality of the circumstances, there were facts that would lead a reasonable detective to conclude that probable cause existed to believe that Racus would engage in the commercial sexual abuse of a minor in exchange for a fee. Thus, the WSP properly authorized the intercept to record the communications with Racus under RCW 9.73.230(1)(b)(ii). Therefore, because intercept authorization was proper, we hold that the trial court did not err by denying the motion to suppress the post-intercept communications.
*303 ¶ 40 Thus, we affirm.
¶ 41 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.
We concur:
Worswick, P.J.
Bjorgen, J.

Racus makes additional arguments noted below.

Ch. 9.73 RCW; RCW 9.73.030.

The State also charged Racus with commercial sexual abuse of a child. At the close of the State's case, the trial court dismissed the charge of commercial sexual abuse of a child.

We set out additional facts related to the issues raised in the unpublished portion of this opinion below.

The instant messaging software in that case was a software program called ICQ. Townsend , 147 Wash.2d at 669, 57 P.3d 255.

Racus also argues that the trial court erred by finding that Det. Rodriguez was the "intended recipient" of the messages; thus, Racus did not consent to the communications being recorded. Appellant's Opening Br. at 30. However, this argument fails because our Supreme Court has held that a defendant's unawareness that the recipient of a message was a police detective does not destroy consent. State v. Athan , 160 Wash.2d 354, 371, 158 P.3d 27 (2007).
Racus also analogizes his case to State v. Hinton , 179 Wash.2d 862, 319 P.3d 9 (2014). In Hinton , the defendant sent text messages to a known associate, and unbeknownst to him, officers had his associate's telephone. Hinton , 179 Wash.2d at 865, 319 P.3d 9. That case is not analogous because the court in Hinton was addressing a claim under article I, section 7 of our state constitution, not a claim under the WPA. Hinton , 179 Wash.2d at 877, 319 P.3d 9.